*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JAMES CURTIS BECK,

Defendant-Appellant.

UNPUBLISHED
October 17, 2019

Nos. 342039; 342043
Macomb Circuit Court
LC Nos. 2016-000309-FH;
       2017-001376-FC

Before: METER, P.J., and O'BRIEN and SWARTZLE, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial convictions of two counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b, and three counts of second-degree criminal sexual conduct (CSC-II), MCL 750.520c, related to his sexual predation of two minor victims, TG (lower court number 2016-000309-FH, Docket No. 342039), and CS (lower court number 2017-001376-FC, Docket No. 342043). CS was 12 years old and TG was between 10 and 12 years old at the time of the offenses. We affirm.

## I. BACKGROUND

Defendant was first tried for his misconduct with TG in LC No. 2016-000309. Nonetheless, after the trial court learned that a juror had potentially brought extraneous information into the jury room, the trial court declared a mistrial. Before the retrial on those charges, defendant was arrested in LC No. 2017-001376-FC for the charges involving CS. The prosecution then moved to join the offenses for a single trial, requesting in the alternative for the admission of the two sets of assaults under MCL 768.27a as other-acts evidence in the separate trials. Acknowledging that defendant's conduct with each victim would be admissible at both trials under MCL 768.27a, the trial court granted the motion for a single trial.

### A. DEFENDANT'S ASSAULT OF CS

CS was the first victim to testify at the joint trial. According to CS, when she was 12 years old, she visited defendant's trailer, where he lived with his teenage son, CB. CS testified that she arrived at the trailer with JK, CB's 18-year-old male friend, and BT, her own female

-1-

friend. All four persons spent the night at the trailer, but it is unclear whether defendant was present. According to CS, the first night she was at the trailer, she and JK "like had sex" on the couch in the living room but "it wasn't really like sex" because "he couldn't really do it" "because it hurt."

CS first met defendant the next afternoon when he came home from work and gave CB a bottle of "Fireball" for his birthday. According to CS, everyone except defendant went into CB's bedroom and CB drank most of the bottle of Fireball and she drank the remainder. CS testified that she and CB were drunk. At some point, CS began to dance. CS testified that defendant came up behind her, put his hands on her hips, and she could feel his penis touch her butt. Others present testified that CS and defendant did in fact dance together, but disagreed on who initiated the encounter, with defendant adamantly denying that he sought the dance and claiming that he moved away after a few moments.

At some point, BT, JK, and CB went for a walk, leaving CS in the trailer with defendant because she was too inebriated to walk. According to CS, once he was alone with her, defendant picked her up and took her into his bed. CS testified that defendant pulled down her pants and underwear and attempted to put his penis in her vagina. CS testified, "It hurt," and clarified that defendant was not "just feeling the outside of [CS's] vagina," but rather "was trying to stick it in." CS later reiterated that defendant's penis did go inside her vagina.

CS testified that she told defendant to "stop" more than once and that defendant did not "stop" until she vomited on his bed. According to CS, at that point, she pulled up her underwear, ran to the bathroom, got on her knees and continued vomiting into the toilet. CS testified that defendant came up behind her, pulled her underwear down to her thighs, and "trie[d] to do it again," stating that defendant kept "poking" his penis at her vagina while she was still vomiting.

The assault ended when BT, JK, and CB returned from their walk and CS revealed the rape to them. JK took CS to BT's home, where CS took a shower. The following day, CS spoke with Detective Chris Delor, who referred her to a sexual assault nurse examiner, Sara Super. As part of the examination, Super obtained a history from CS of her chief complaint. Super testified at trial, indicating that CS told her that she had a few sips of "Fireball," that defendant assaulted her twice—first in his bed and again in the bathroom—and that defendant put "his penis into [CS's] vagina." According to Super, CS also revealed that defendant had fondled her vagina with his hands. Super testified that CS had physical injuries on her clitoral hood and labia majora, as well as bruises on her breasts and neck. Super took a buccal swab of CS's outer vagina and breasts. The swabs returned DNA from JK, but not defendant; however, CS was a contributor to a swab obtained from defendant's underwear. Defendant argued that CS's DNA was transferred to his underwear from CS's vomit on defendant's bed.

## B. DEFENDANT'S ASSAULT OF TG

TG's mother was married to defendant from 2013 until 2016, and TG lived with defendant for a time in the aforementioned trailer. According to TG, defendant would drink often and his mood would change when he drank. TG testified that, in February 2013, she was sitting on defendant's lap while he was using the home computer with her knees "up and . . . closed." According to TG, defendant opened her knees and started rubbing her vagina on top of

her sweatpants. TG testified that she closed her legs, but defendant reopened her legs and started rubbing her vagina again, at which point TG got up and walked away.

TG testified that, on another occasion, she was at a community swimming pool and defendant was throwing kids into the pool. According to TG, when it was her turn, defendant "stuck his fingers, like, on my hips inside of my bathing suit." TG stated that, on another occasion, she walked with defendant to buy a bottle of liquor and defendant bought her an ice cream and told her that she "owed him 30 minutes." According to TG, when they arrived back home, defendant told her to go into her bedroom until the other children had gone to bed, at which point she was to come out and sit on the couch. TG testified that she complied with defendant's commands and defendant started tickling her, putting his hand up her shirt and touching her breasts while she was not wearing a bra. TG informed her mother of the incident and eventually talked to a school counselor and police.

## C. OTHER VICTIMS

Defendant's biological daughter, AR, testified that, while she lived with defendant just before she turned sixteen, defendant would sexually abuse her three or four nights per week. Defendant had strict bedtimes for all the children in his home and he provided AR with her own bedroom. AR testified that defendant would come into her bedroom after bedtime and massage her back, eventually working his way to her chest and vagina, usually underneath her clothes. According to AR, defendant would remove her clothes, touch her vagina, and "either perform oral or use his hands."

One of defendant's other daughters, AB, corroborated AR's testimony that defendant would enter her room three or four nights per week. AB further testified that defendant would come into her room when she and her friends were changing and that defendant would enter the bathroom while she was taking a shower, sitting on the toilet next to the see-through shower curtain. According to AB, defendant also rubbed his hands on the inside of her thighs at a bonfire and once grabbed her and kissed her on the lips. AB was between 13 and 15 years old at the time of these incidents. Another of defendant's daughters testified that defendant would playfully "smack her butt," speak sexually to her and her friends, and would suck on her toes and put her entire toe in his mouth. Thirteen-year-old WB testified that defendant sexually touched his butt underneath his clothes and underwear when he was in defendant's bed. Several of defendant's children testified at trial. Some of these children testified that defendant coached their testimony, but CB testified that, although he had talked with defendant, defendant did not tell him what to say at trial.

## D. VERDICT

For his conduct with TG, a jury found defendant guilty of two counts of CSC-II, MCL 750.520c. The jury also found defendant guilty of two counts of CSC-I, MCL 750.520b, and one count of CSC-II, MCL 750.520c, for his conduct with CS. For his sexual assault of TG, the trial court sentenced defendant to concurrent prison terms of 57 months to 180 months for the CSC-II convictions; for his assault of CS, the trial court sentenced defendant to consecutive prison terms of 300 months to 600 months for each CSC-I conviction and to a concurrent term of 57 to 180 months for the CSC-II conviction. This appeal followed.

## II. ANALYSIS

## A. PRETRIAL

## 1. DOUBLE JEOPARDY

Defendant first argues that retrial on the charges related to TG was barred by double jeopardy principles because he did not consent to a mistrial and there was no manifest necessity to declare a mistrial. Both the United States Constitution, US Const, Am V, and the Michigan Constitution, Const 1963, art 1, § 15, protect an accused from successive prosecutions for the same offense once jeopardy has attached. In a jury trial, jeopardy attaches when the jury is impaneled and sworn. *People v Mehall*, 454 Mich 1, 4; 557 NW2d 110 (1997). "Once jeopardy attaches, the defendant has a constitutional right to have his case completed and decided by that tribunal." *People v Henry*, 248 Mich App 313, 318; 639 NW2d 285 (2001) (internal citation and quotation marks omitted). Unless the defendant consents to the trial's interruption or a manifest necessity compels a mistrial before a verdict is reached, the defendant cannot be brought to trial again. *Mehall*, 454 Mich at 4; *People v Lett*, 466 Mich 206, 215; 644 NW2d 743 (2002) (stating that a mistrial premised on manifest necessity does not bar a retrial).

Manifest necessity refers to "the existence of sufficiently compelling circumstances that would otherwise deprive the defendant of a fair trial or make its completion impossible." *People v Rutherford*, 208 Mich App 198, 202; 526 NW2d 620 (1994). "The constitutional concept of manifest necessity does not require that a mistrial be '*necessary*' in the strictest sense of the word. Rather, what is required is a 'high degree' of necessity." *Lett*, 466 Mich at 218 (internal citation omitted). Whether manifest necessity exists depends on the facts of each particular case and requires the trial court to balance "the strength of the justification for a mistrial" against "the defendant's interest in completing his trial in a single proceeding before a particular tribunal." *People v Hicks*, 447 Mich 819, 829; 528 NW2d 136 (1994). The reviewing court must consider whether a "trial judge exercised 'sound discretion' in declaring a mistrial." *Arizona v Washington*, 434 US 497, 514; 98 S Ct 824; 54 L Ed 2d 717 (1978).

Here, a juror informed the trial court that two jurors had brought outside information into the jury's deliberations. The trial court polled the jury on the subject by blind, paper submissions and one juror indicated that he or she had "heard . . . a juror . . . looking into another discretion [sic] within his family." Another juror indicated that he or she "asked my mom about her past experience." The trial court declared a mistrial, indicating that there was no way to ensure that the entire jury pool had not been subject to improper outside information.

The jury's duty is to render its verdict on the basis of only the evidence properly admitted at trial. Because serious questions existed as to whether the jury could fulfill this basic duty in light of the extraneous information brought to its attention, we agree with the trial court that sufficiently compelling circumstances existed that would have deprived defendant of a fair trial. Although the prosecution proposed proceeding with two alternate jurors, we agree with the trial court that the entire jury was potentially subject to the improper influence. At the very least, the fact that a juror had overheard that improper information was brought into the jury room by another juror—rather than hearing the information first-hand from the juror—indicates that more than two jurors were potentially subject to the improper outside information. Substituting two

alternate jurors would therefore be insufficient to cure the improper influence. In short, the trial court exercised sound discretion in declaring the mistrial; therefore, defendant's subsequent trial did not violate double jeopardy.

## 2. JOINT TRIAL

Defendant asserts that the trial court abused its discretion by joining the charges for a single trial. "[D]ecisions regarding joint or severed trials for related charges lie firmly within the discretion of trial courts." *People v Breidenbach*, 489 Mich 1, 14; 798 NW2d 738 (2011). MCR 6.120(B) provides that the trial court may join offenses charged in separate informations against a single defendant "when appropriate to promote fairness to the parties and a fair determination of the defendant's guilt or innocence of each offense." Joinder is appropriate when the offenses are "related," i.e., if they are based on "the same conduct or transaction," "a series of connected acts," or "a series of acts constituting parts of a single scheme or plan." MCR 6.120(B)(1). Joinder is appropriate when the charges are "logically related" and "there is a large area of overlapping proof." *People v Williams*, 483 Mich 226, 237; 769 NW2d 605 (2009) (internal citation and quotation marks omitted). "Other relevant factors include the timeliness of the motion, the drain on the parties' resources, the potential for confusion or prejudice stemming from either the number of charges or the complexity or nature of the evidence, the potential for harassment, the convenience of witnesses, and the parties' readiness for trial." MCR 6.120(B)(2).

Defendant argues that joinder was inappropriate because the offenses were not related and there was a potential for prejudice because CB could have potentially been used as a prosecution witness in one case and a defense witness in another case. We disagree. Regarding relatedness, the charges all concern defendant's sexual misconduct with a young girl about the age of 12. The crimes each occurred in defendant's home or while the child was in defendant's care and all the offenses occurred within a six-year time frame. Given that each set of charges would have been admissible under MCL 768.27a as propensity evidence on the other set, regardless of whether the charges were tried jointly, the jury would have been privy to nearly the entirety of the evidence presented in the joint trial in each individual case. Jointly trying the charges prevented the young witnesses from repeatedly testifying on sensitive subject matter and conserved valuable court resources, not the least of which was the jury pool.

Regarding defendant's argument that jointly trying the charges meant that CB would potentially be used as a prosecution witness on one set of charges and a defense witness on the other, we do not believe that this situation created sufficient prejudice to deny the motion for a joint trial. It is not uncommon for parties to argue that the jury should believe part, but not all, of a witness's testimony and we see no reason why defendant could not make that argument in this case. For these reasons, we therefore affirm the trial court's order jointly trying the charges set forth in the two informations.

## 3. SIMILAR-ACTS EVIDENCE UNDER MCL 768.27A

Relatedly, defendant argues that the trial court improperly admitted similar-acts evidence under MCL 768.27a because the trial court failed to properly conduct the MRE 403 balancing test and consider the factors set forth in *People v Watkins*, 491 Mich 450; 818 NW2d 296 (2012),

to determine whether the evidence was substantially more prejudicial than probative. Similarly, defendant argues that several alleged similar acts were not listed offenses under MCL 28.722 and were therefore not admissible under MCL 768.27a. We decline to address these arguments, however, because defendant has not sufficiently briefed these issues to raise them before this Court. Regarding, MRE 403, defendant merely announces that "the prejudicial effect of the evidence was clear throughout the course of the trial" and that he "was not afforded a fair trial due to the overwhelming volume and the substantial prejudicial effect of the claimed similar acts evidence, which was not properly weighed for prejudicial effect." Defendant provides no meaningful analysis or discussion on this issue. Concerning MCL 28.722, defendant does not provide any argument or analysis, beyond stating that "listed offenses are Tier I, Tier II or Tier III offenses, which are CSC 1st, 2nd, 3rd and 4th" in announcing his conclusion that the alleged similar acts were not listed offenses.

"An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *People v Payne*, 285 Mich App 181, 195; 774 NW2d 714 (2009) (internal citation and quotation marks omitted). "An appellant's failure to properly address the merits of his assertion of error constitutes abandonment of the issue." *People v Miller*, 326 Mich App 719, 739; 929 NW2d 821 (2019) (internal citation and quotation marks omitted). Because defendant has failed to adequately brief these issues with any legal analysis, we deem them abandoned and decline to address them further.

### 4. LATE ENDORSEMENT OF A WITNESS

Defendant contends that the trial court abused its discretion by allowing the prosecution to add Special Agent Richard Buyse to its witness list six days before trial in violation of MCL 767.40a(3) and without showing good cause for the late endorsement. The decision to allow late endorsement of a witness to the witness list is reviewed for an abuse of discretion. *People v Canter*, 197 Mich App 550, 563; 496 NW2d 336 (1992).

Richard Buyse, a Special Agent with the Alcohol, Tobacco, Firearms, and Explosives unit testified at trial that he interviewed defendant for 7½ hours on March 7, 2017. Agent Buyse went over the advice of rights form and statement of consent with defendant. Defendant signed both forms. Special Agent Buyse testified that defendant admitted that he had danced with individuals besides CS, but denied ever touching CS. Special Agent Buyse, continued, however, that "[f]urther on in the interview, when dancing was brought up again, he did admit that she backed her bottom up into her (sic) groin area. He said it was for approximately three seconds. And then he backed away, he said."

MCL 767.40a(3) requires the prosecutor to provide a witness list to defense counsel not less than 30 days before the trial. MCL 767.40a(4) permits a prosecutor to add or delete from the list of trial witnesses "at any time upon leave of the court and for good cause shown or by stipulation of the parties." If this statute is violated, the defendant must show prejudice from the violation before he is entitled to relief. *People v Hana*, 447 Mich 325, 358 n 10; 524 NW2d 682 (1994), amended on reh in part by 447 Mich 1203 (1994).

The prosecution admits that it was negligent in failing to timely amend the witness list in accordance with MCL 760.40a. This admission is not surprising given that this Court has already stated that "[m]ere negligence of the prosecutor is not the type of egregious case for which the extreme sanction of precluding relevant evidence is reserved." *People v Callon*, 256 Mich App 312, 327-328; 662 NW2d 501 (2003). Nonetheless, we need not determine whether the prosecution was more than negligent in failing to amend its witness list, because, on this record, it does not appear that defendant was prejudiced by the late endorsement.

Special Agent Buyse's report had been provided to defense counsel during discovery and, therefore, the defense was aware of Special Agent Buyse and his potential testimony. Further, the contents of defendant's own statement could not have been a surprise to defendant. Finally, defendant did not admit any impropriety in the statement, but rather maintained that no sexual activity occurred between him and CS. Defense counsel cross-examined Special Agent Buyse at trial and there is no indication that he was unprepared to do so. Under these circumstances, defendant has not shown that he was prejudiced by the late admission and, thus, he is not entitled to relief.

## 5. MOTION TO SUPPRESS DEFENDANT'S STATEMENT

Next, defendant argues that the trial court erred by failing to suppress his videotaped statements to police during his interrogation because he was not advised that he had the right to consult with an attorney before questions and to have an attorney present during questioning and, therefore, his waiver of his *Miranda*[1] rights was not valid. We need not answer this question, however, because we conclude that any erroneous admission of defendant's interrogation was harmless.

"A preserved constitutional error is harmless if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *People v Cortez (On Remand)*, 299 Mich App 679, 725; 832 NW2d 1 (2013) (internal citation and quotation marks omitted). Most importantly, in the video, defendant denied having any sexual relationship with CS, which was consistent with his position at trial. Defendant argues that the admission of the video prejudiced him because the prosecution referenced the video in closing, arguing that defendant was "pompous, cocky, rude, manipulative, and scarry [sic]." The jury, however, was able to observe defendant's demeanor at trial and draw its own conclusions. Moreover, several minor victims testified that defendant had inappropriately touched them and the two victims at issue in this case described in graphic detail the specific assaults alleged in the informations. Physical evidence corroborated, to a degree, the testimony. On this record it is clear beyond a reasonable doubt that the jury would have found defendant guilty had the video of defendant's interrogation not been admitted. Defendant is not entitled to relief.

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 693 (1966).

## B. TRIAL

### 1. HEARSAY

Next, defendant argues that the trial court erroneously admitted several pieces of hearsay evidence which bolstered CS's testimony and denied him a fair trial. We review this unpreserved issue for plain error affecting defendant's substantial rights. *People v Osby*, 291 Mich App 412, 414; 804 NW2d 903, 490 Mich 873 (2011). Hearsay is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Hearsay is generally inadmissible except as provided by the rules of evidence. MRE 802.

*CS's Statements to the Sexual Assault Nurse Examiner.* First, defendant challenges the sexual assault nurse examiner's testimony regarding statements made to her by CS, arguing that these statements were precluded from the exception provided by MRE 803(4) because the statements were made to investigate defendant rather than to medically treat CS.

"Statements made for the purpose of medical treatment are admissible pursuant to MRE 803(4) if they were reasonably necessary for diagnosis and treatment and if the declarant had a self-interested motivation to be truthful in order to receive proper medical care." *People v Mahone*, 294 Mich App 208, 214-215; 816 NW2d 436 (2011). The "rationale for MRE 803(4) is the existence of (1) the self-interested motivation to speak the truth to treating physicians in order to receive proper medical care, and (2) the reasonable necessity of the statement to the diagnosis and treatment of the patient." *People v Meeboer (After Remand)*, 439 Mich 310, 322, 484 NW2d 621 (1992). An injury need not be readily apparent. *Mahone*, 294 Mich App at 215. Moreover, "[p]articularly in cases of sexual assault, in which the injuries might be latent, such as contracting sexually transmitted diseases or psychological in nature, and thus not necessarily physically manifested at all, a victim's complete history and a recitation of the totality of the circumstances of the assault are properly considered to be statements made for medical treatment." *Id*.

Defendant asserts that CS's statements were not admissible under MRE 803(4) because they were made for purposes of prosecution rather than medical treatment. However, defendant does not offer any argument or explanation in support of this assertion. Accordingly, defendant has abandoned the argument. *Miller*, 326 Mich App at 739. Moreover, in cases of sexual assault, statements made for the purposes of identifying the assailant or describing the cause or external source of injury are reasonably necessary for purposes of medical treatment or diagnosis. *Meeboer (After Remand)*, 439 Mich at 322. Here, according to the nurse examiner, CS stated that defendant put his hands on her vagina, held her down, and engaged in penile penetration. These statements identify CS's assailant and explain the cause of many of her injuries; thus they were admissible under MRE 803(4). A closer question exists regarding whether CS's statement that she drank alcohol was for the purposes of medical treatment. Nonetheless, we need not answer this question because any error in admitting the statement was harmless. Several persons testified that CS had consumed alcohol that night. Both our Supreme Court and this Court have consistently held that improperly admitted hearsay evidence constitutes harmless error when it is merely cumulative of other properly admitted evidence. *People v Van Tassel (On Remand)*, 197 Mich App 653, 655-656; 496 NW2d 388 (1992).

-8-

Rather than focusing on the requirements of MRE 803(4), defendant's argument focuses on the reliability of CS's statements. Although statements made for purposes of medical treatment may generally be admitted under MRE 803(4), this Court has held that "[i]n cases of suspected abuse of a child, statements the child makes may be admitted under this exception when the totality of circumstances surrounding the statements supports that they are trustworthy." *People v Duenaz*, 306 Mich App 85, 95; 854 NW2d 531 (2014). Factors to be considered on the issue of trustworthiness include:

> (1) the age and maturity of the declarant, (2) the manner in which the statements are elicited (leading questions may undermine the trustworthiness of a statement), (3) the manner in which the statements are phrased (childlike terminology may be evidence of genuineness), (4) use of terminology unexpected of a child of similar age, (5) who initiated the examination (prosecutorial initiation may indicate that the examination was not intended for purposes of medical diagnosis and treatment), (6) the timing of the examination in relation to the assault (the child is still suffering pain and distress), (7) the timing of the examination in relation to the trial (involving the purpose of the examination), (8) the type of examination (statements made in the course of treatment for psychological disorders may not be as reliable), (9) the relation of the declarant to the person identified (evidence that the child did not mistake the identity), and (10) the existence of or lack of motive to fabricate. [*Meeboer (After Remand)*, 439 Mich at 324-325 (internal citations omitted).]

Defendant argues that factors (2), (5), and (6) weigh against admissibility of CS's statements. The trial court was not given an opportunity to perform a trustworthiness analysis because defendant did not challenge the nurse examiner's testimony at trial. Nonetheless, defendant argues that factors (2) and (6) weighed against admissibility because "leading questions were used" and because CS was not "suffering pain or distress." Defendant, however, has not identified which questions were "leading." Additionally, the nurse examiner examined CS one day after the sexual assault and it is reasonable to conclude that a 12-year-old child who had recently been sexually assaulted would be suffering from emotional distress, at the least. With respect to factor (5), defendant seemingly contends that the examination was initiated by the prosecution for the purpose of investigating whether to prosecute defendant. There is nothing in the record, however, to suggest that the prosecution, rather than police officers, initiated the examination. Accordingly, defendant has failed to show that the statement was untrustworthy. Defendant's argument that the trial court erred in admitting the sexual assault nurse examiner's testimony is without merit.

*CB's testimony.* Defendant also argues that the prosecution introduced hearsay and double hearsay through its examination of CB. Defendant fails to cite the location in the transcript where the alleged errors occurred. By failing to cite the transcript, defendant has abandoned this argument. See *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998).

Nonetheless, it appears that defendant's argument is premised on CB's testimony at trial that the statements he provided to the police were not based on first-hand knowledge but, rather, were based on things that others had told him. The prosecutor then used CB's prior written

statement to the police to impeach CB's trial testimony. In particular, the prosecution used the prior statement to impeach CB's claim that he did not have first-hand knowledge of the events occurring on the night in question and to show that CB's version of the events had changed. Although defendant argues that this evidence constitutes hearsay, this Court has already held that a prior inconsistent statement does not constitute hearsay because "[t]he purpose of extrinsic impeachment evidence is to prove the witness made a prior inconsistent statement—not to prove the contents of the statement." *People v Jenkins*, 450 Mich 249, 256; 537 NW2d 828 (1995). Defendant's argument is therefore without merit.

## 2. PROSECUTORIAL MISCONDUCT

Defendant argues that he was denied a fair trial by several instances of prosecutorial misconduct. Prosecutorial misconduct issues are decided on a case-by-case basis. *People v Grayer*, 252 Mich App 349, 357; 651 NW2d 818 (2002). This Court reviews "the prosecutor's remarks in context to determine whether the defendant was denied a fair and impartial trial." *Id*. "A prosecutor may deny a defendant's right to a fair trial by making improper remarks that infringe on a defendant's constitutional rights or by making remarks that so infect the trial with unfairness as to make the resulting conviction a denial of due process." *People v Miller*, 326 Mich App at 734 (internal citation, quotation marks, and brackets omitted). Generally, prosecutors are given great latitude regarding their arguments and are "free to argue the evidence and reasonable inferences from the evidence as they relate to their theory of the case." *People v Seals*, 285 Mich App 1, 22; 776 NW2d 314 (2009).

Defendant first argues that the prosecutor engaged in misconduct by arguing facts not in evidence. Although prosecutors generally have great latitude regarding their conduct and arguments, they may not make a statement of fact to the jury that is unsupported by the evidence. *People v Stanaway*, 446 Mich 643, 686; 521 NW2d 557 (1994). Specifically, defendant argues that the prosecutor improperly argued that the case was about a "true pedophile" and explained, without evidentiary support, the behavior of a pedophile. We agree that the prosecutor's references to the behavioral characteristics of pedophiles were improper. Nonetheless, the references were not so egregious that any prejudice could not have been remedied by a curative instruction, which defendant did not request. See *People v Bennett*, 290 Mich App 465, 475-476; 802 NW2d 627 (2010). Indeed, the evidence showed that defendant had engaged in a pattern of sexually abusing children and it is therefore unlikely that the prosecutor's references to pedophilic behavior swayed the jury's deliberations. Accordingly, defendant is not entitled to relief from this error.

Additionally, defendant argues that the prosecutor committed misconduct when she told the jury during closing arguments that CS's version of events had been consistent throughout the investigation. A prosecutor may comment on her own witness's credibility during closing argument, especially when there is conflicting evidence and the question of the defendant's guilt depends on which witnesses the jury believes. *People v Thomas*, 260 Mich App 450, 455; 678 NW2d 631 (2004). The evidence at trial supported the prosecutor's argument and defendant's claim of error is without merit.

Defendant next argues that the prosecutor improperly denigrated defendant's character when she argued:

Now, lastly, ladies and gentlemen, you heard from the officer in charge of this case, Detective Delor. You got to see for yourselves the entire interview that he did with the Detective Dobkowski and the defendant. And ladies and gentlemen, I suggest to you, that man you saw in that video is the same man that everyone has come here and testified about, that you can't see now. But, everything you saw in that video is who this man really is. He's pompous, he's cocky, he's rude, he [sic] manipulative, he's scarry [sic].

A prosecutor "must refrain from denigrating a defendant with intemperate and prejudicial remarks." *People v Bahoda*, 448 Mich 261, 283; 531 NW2d 659 (1995). Here, the prosecutor's comments did not involve inherently prejudicial terms, such as racial or ethnic slurs. See *id*. at 266. Rather, the comment was a reasonable interpretation of the video shown to the jury. The jury was able to come to its own conclusions about the video and defendant and any prejudicial effect could have been alleviated by a curative instruction. See *Bennett*, 290 Mich App at 475-476. Again, we note that, to the extent that the comment brought the jury's attention to the video, defendant made no admission in the video; rather, he denied any sexual activity with CS. As we have already decided, it is clear beyond a reasonable doubt that the jury would have convicted defendant had the video not been admitted. The prosecutor's comment on the video was similarly inconsequential. Defendant is not entitled to relief on the basis of these comments.

Defendant also argues that the prosecutor engaged in misconduct by denigrating defense counsel. Just as a prosecutor may not denigrate a defendant, a prosecutor may not personally attack defense counsel, *People v McLaughlin*, 258 Mich App 635, 646; 672 NW2d 860 (2003), or suggest that defense counsel is intentionally trying to mislead the jury, *People v Unger*, 278 Mich App 210, 236; 749 NW2d 2008.

Defendant challenges the following remark:

It's because of that lab result [showing the presence of CS's DNA in defendant's underwear], ladies and gentlemen, the defense has to Monday morning quarterback. They have to figure out what crazy story they can come up with to justify [CS's] DNA in his underwear. This transfer thing is going to be the best that they can come up with. Ladies and gentlemen, *I suggest to you that the defendant would also try and sell you the idea that the world is square instead of a circle.* [Emphasis added.]

Additionally, defendant argues that the prosecutor engaged in misconduct during rebuttal by referring to defense counsel's argument as a "red herring."

The latter comment is plainly not improper. A prosecutor's argument, based on the evidence, that a defense theory should be rejected is not inappropriate, *People v Howard*, 226 Mich App 528, 544-545; 575 NW2d 16 (1997), and there is nothing inherently inflammatory about the term "red herring." With respect to the former comment, the comment is most fairly characterized as an argument that the jury should reject the defense theory, rather than an attempt to shift the jury's focus from the evidence to the character of defendant or defense counsel. See *Unger*, 278 Mich App at 236. On balance, the comment does not rise to the level of "accusatory

prejudice" that supports a claim of prosecutorial misconduct. See *People v Dobek*, 274 Mich App 58, 67; 732 NW2d 546 (2007).

Lastly, defendant argues that the prosecutor improperly withheld a DNA report from defendant. Even assuming, however, that the prosecutor did not timely provide the report to defendant, defendant has offered no argument attempting to demonstrate prejudice as a result of the alleged impropriety. Consequently, defendant has abandoned this claim. *Miller*, 326 Mich App at 739.

### 3. DEFENDANT'S RIGHT AGAINST SELF-INCRIMINATION

Relatedly, defendant argues that the prosecutor committed misconduct and violated his right against self-incrimination when she asked questions that elicited testimony from a detective that defendant declined his request to come to the police station in reference to a report that had been filed against him and that she was not able to interview him about TG's allegations. Defense counsel immediately objected to the testimony and, after a sidebar discussion, the trial court instructed the jury as follows:

> The question was asked that made an inference, possibly, and I don't want the jury to get the wrong inference, but any person has the right to not speak at any time to the police, if they choose to. They have a right to not incriminate themselves. So you can't make any inferences whether someone did or did not speak to the police, which might have been inferred in the question. That's a constitutional right.

The trial court's prompt and strongly worded instruction served to cure any prejudice from the questions and responses and assured that defendant was not denied a fair trial. See *Unger*, 278 Mich App at 235 ("Curative instructions are sufficient to cure the prejudicial effect of most inappropriate prosecutorial statements, and jurors are presumed to follow their instructions.") (internal citations omitted). Defendant is not entitled to relief.

### 4. DEFENDANT'S RIGHT OF CONFRONTATION

Defendant argues that he was denied his constitutional right of confrontation when JK invoked his Fifth Amendment right against self-incrimination, indicating that he would not testify about anything occurring before and including the time that he had sexual relations with CS. The trial court allowed JK to limit his testimony to events occurring after the time he had sexual relations with CS. Whether a defendant was denied his Sixth Amendment right to confrontation is a question of constitutional law which we review de novo. *People v Pipes*, 475 Mich 267, 274; 715 NW2d 290 (2006).

In every criminal trial, the federal and state constitutions protect a defendant's right to be confronted with the witnesses against him. US Const, Am VI; Const 1963, art 1, § 20. A primary interest secured by the right to confrontation is the right of cross-examination. *People v Adamski*, 198 Mich App 133, 138; 497 NW2d 546 (1993). "A limitation on cross-examination that prevents a defendant from placing before the jury facts from which bias, prejudice, or lack of credibility of a prosecution witness might be inferred constitutes denial of the constitutional right

of confrontation." *Kelly*, 231 Mich App at 644. Nonetheless, "neither the Confrontation Clause nor due process confers an unlimited right to admit all relevant evidence or cross-examine on any subject." *Adamski*, 198 Mich App at 138. "The Confrontation Clause guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *United States v Owens*, 484 US 554, 559; 108 S Ct 838; 98 L Ed 2d 951 (1988) (internal citation, quotation marks, and brackets omitted; emphasis in original).

Defendant relies on *People v Thomas*, unpublished per curiam opinion of the Court of Appeals, issued June 26, 2012 (Docket No. 302344), for the proposition that "a defendant's constitutional rights are violated when the 'privileged' testimony is relevant to the witness's direct testimony and not merely collateral." In *Thomas*, the defendant argued that his constitutional rights to confront the witnesses against him were violated when a witness asserted her Fifth Amendment privilege against self-incrimination during cross-examination. *Id.*, unpub op at 2. The defendant argued that the trial court erred by failing to strike the witness's testimony in its entirety. *Id.* This Court disagreed, stating:

> We conclude that defendant's constitutional right to confrontation was not violated when the trial court failed to strike all of [the witness's] testimony. [The witness's] assertion of her Fifth Amendment privilege did not preclude inquiry into the details of her direct testimony. . . . Moreover, [the witness's] limited assertion of her Fifth Amendment privilege did not deprive the defense "of the right to test the truth of [the witness's] direct testimony." [*Id.*, unpub op at 3 (internal citation omitted).]

Here, JK's invocation of his Fifth Amendment privilege precluded the defendant from inquiring about JK's sexual relationship with CS. JK's sexual relationship with CS, however, was not detailed in his direct testimony. Thus, defendant was not deprived of the ability to cross-examine JK to test the believability of testimony elicited on direct examination. Defendant was not denied his right of confrontation.

Relatedly, defendant argues that he was denied his right of confrontation by the prosecution's failure to grant JK use immunity. Defendant maintains that, had the prosecution granted JK use immunity, JK would have corroborated the defense theory that JK's sexual interaction with CS caused CS's injuries, not the alleged assaults by defendant. Defendant, however, has failed to cite any authority to support his argument that the prosecutor was required to grant use immunity to a witness in order to secure that witness's testimony; therefore, he has abandoned this issue. *Miller*, 326 Mich App at 739; *Payne*, 285 Mich App at 195.

## 5. SUFFICIENCY OF THE EVIDENCE IN LC NO. 2017-001376-FC

Next, defendant challenges the sufficiency of the evidence supporting one of his CSC-I convictions for his conduct with CS. Challenges to the sufficiency of the evidence are reviewed de novo. *People v Solloway*, 316 Mich App 174, 180; 891 NW2d 255 (2016). The reviewing Court must determine if, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could find that the prosecution proved each essential element of the crime beyond a reasonable doubt. *People v Reese*, 491 Mich 127, 139; 815 NW2d 85 (2012). A trier

of fact may consider circumstantial evidence and all reasonable inferences that evidence creates. *Solloway*, 316 Mich App at 180-181. "It is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *People v Flick*, 487 Mich 1, 24-25; 790 NW2d 295 (2010) (internal citation and quotation marks omitted).

Defendant argues that CS's testimony that defendant's "poking" his penis at her vagina in the bathroom was too ambiguous to prove beyond a reasonable doubt that defendant's penis penetrated CS's genital opening and that the evidence was therefore insufficient to support one of the two CSC-I convictions. We disagree.

For purposes of CSC-I, "sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body, but emission of semen is not required." MCL 750.520a(r). "Genital opening," for a female victim, includes external genital organs such as the labia majora. See *People v Whitfield*, 425 Mich 116, 135 n 20; 388 NW2d 206 (1986). The jury was instructed consistent with this statutory provision. After CS testified that defendant put his penis inside her vagina in the bedroom, she almost immediately testified that defendant "did it again" in the bathroom. She testified that defendant poked his penis at her vagina and that it "hurt." A reasonable inference arising from this testimony is that there was an intrusion of defendant's penis into the victim's genital opening during this time. Indeed, this is the credibility determination the jury appears to have made and we must respect that determination on appeal. Thus, viewing the evidence in the light most favorable to the prosecution, the prosecution presented sufficient evidence from which the jury could conclude that penetration did occur during the second assault in the bathroom.

## C. SENTENCING

Next, defendant challenges the sentences imposed by the trial court for his assault of CS. As noted previously, for his assault of TG, the trial court sentenced defendant to concurrent prison terms of 57 months to 180 months for two CSC-II convictions; for his assault of CS, the trial court sentenced defendant to consecutive prison terms of 300 months to 600 months for two CSC-I convictions and to a concurrent term of 57 to 180 months for one CSC-II conviction.

Under MCL 750.520b(2)(b), the trial court was required to impose a mandatory minimum sentence of not less than 25 years for each of defendant's CSC-I convictions. The trial court ordered the two CSC-I convictions to be served consecutive to each other under MCL 750.520(3). Under that statute, the trial court "may order a term of imprisonment imposed under this section to be served consecutively to any term of imprisonment imposed for any other criminal offense arising from the same transaction." Because defendant was convicted of two counts of CSC-I from the same transaction, the trial court had discretion to order that each sentence be served consecutive to the other. The trial court's discretionary decisions—including its exercise of sentencing discretion—are reviewed for an abuse of discretion. *People v Steanhouse*, 500 Mich 453, 459-460; 902 NW2d 327 (2017), vacated in part on other grounds, ___ Mich ___ (2019); *People v Norfleet*, 317 Mich App 649, 663; 897 NW2d 195 (2016). A trial court abuses its discretion when it selects an outcome that falls outside the range of

reasonable and principled outcomes. *People v Yost*, 278 Mich App 341, 353; 749 NW2d 753 (2008).

First, defendant argues that the trial court violated the principle of proportionality by imposing consecutive sentences for the two CSC-I convictions. Defendant essentially contends that the consecutive sentences constituted a "departure" from the sentencing-guidelines range and that the trial court "failed to justify a sentence twice as long" as the mandatory minimum under the sentencing guidelines. Defendant, however, has not presented this issue under the correct framework. A "proportionality challenge to a given sentence must be based on the individual term imposed and not on the cumulative effect of multiple sentences." *Norfleet*, 317 Mich App at 663. In determining whether a sentence is disproportionate to the circumstances surrounding the offense and offender, this Court must review each sentence "on its own merits." *Id*. Here, the trial court imposed the mandatory minimum sentence for each CSC-I conviction and sentences within the legislative guidelines are presumed proportionate. *People v Powell*, 278 Mich App 318, 323; 750 NW2d 607 (2008).

This is not to say, however, that the trial court's decision to impose consecutive sentences is unreviewable. *Norfleet*, 317 Mich App at 663. Rather, when, as here, the trial court exercises a discretionary power to impose consecutive sentences, its decision to do so is reviewed for an abuse of discretion. *Id*. at 664. Again, the trial court abuses its discretion when it selects an outcome that falls outside the range of reasonable and principled outcomes. *Yost*, 278 Mich App at 353. The trial court must articulate on the record the reasons for imposing the consecutive sentences. *Norfleet*, 317 Mich App at 664-665.

Defendant presents only a proportionality argument, arguing that trial court's consecutive sentences do not comport with the principle of proportionality set forth in *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990). Again, this argument is misplaced. By failing to present his argument under the proper framework, defendant has abandoned it. *Miller*, 326 Mich App at 739. That being said, had defendant not abandoned the argument, we would conclude that the trial court did not abuse its discretion by imposing consecutive sentences. Even within the category of sexual assaults of minors, defendant's conduct stands out as particularly egregious. Defendant callously assaulted two young girls, one of which was his stepdaughter, as part of a pattern of predatory conduct involving children. On this record, we agree with the trial court that defendant was a "threat to [the] community." Consecutive sentencing was within the range of principled outcomes and therefore the trial court did not abuse its discretion by imposing consecutive sentencing.

Defendant's argument against the consecutive nature of his sentences is better addressed through his related argument that the sentences are cruel and unusual. In this light, defendant argues that the sentences are grossly disproportionate to his crimes because he is facing a minimum of 50 years of imprisonment. He acknowledges that this Court has held that the 25-year mandatory minimum sentence under MCL 750.520(2)(b) does not violate the cruel and unusual provision of the Eighth Amendment or the cruel or unusual provision of Const 1963, art 1, § 16, see *People v Benton*, 294 Mich App 191, 203-207; 817 NW2d 599 (2011), but maintains that the consecutive nature of the mandatory minimum sentences renders the sentence cruel and unusual.

A sentence constitutes cruel or unusual punishment when it is grossly disproportionate to the seriousness of the circumstances surrounding the offense and the offender.[2] See *People v Bullock*, 440 Mich 15, 32; 485 NW2d 866 (1992). In determining whether a punishment is so disproportionate as to be constitutionally cruel or unusual, this Court looks to the gravity of the offense and the harshness of the penalty, and compares the penalty to that imposed for other crimes in this state and to the penalty imposed for the same offense in other states. *Benton*, 294 Mich App at 204.

Defendant, however, has not undertaken this type of analysis. He argues only that the "minimum sentence of 600 months is nearly three times the upper end of the appropriate, presumptively proportionate minimum sentence" under the sentencing guidelines. Defendant summarily asserts that "offenders with far more violent backgrounds and far more serious crimes are sentenced to lesser terms." Defendant, however, provides no particularized argument comparing his consecutive sentences to his conduct. Again, an "appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority." *Payne*, 285 Mich App at 195 (internal citation and quotation marks omitted). Defendant has therefore abandoned this argument. Moreover, had defendant not abandoned the argument, we would find that his sentences were not grossly disproportionate to his conduct. The legislature authorized consecutive sentencing for this type of criminality and, again, defendant's predation of several young children indicates that he is significant danger to the community.

## D.  STANDARD 4 BRIEF

In his Standard 4 brief,[3] defendant argues that the search warrant authorizing the search of his home was authorized after the search and, therefore, that the evidence seized during the search was inadmissible at trial. There is no indication in the record that defendant made a pretrial motion to suppress. In support of his argument, defendant cites the warrant used to execute the search and its underlying affidavit. Neither of these items is part of the lower court record; defendant has simply attached them to his Standard 4 brief on appeal. Defendant cannot enlarge the record by including these items for the first time on appeal. *People v Warren*, 228 Mich App 336, 356; 578 NW2d 692 (1998), aff'd in part, rev'd in part on other grounds 461 Mich 415 (2000). Accordingly, this Court has no basis on which to decide this issue.

Finally, defendant argues that the prosecutor committed misconduct by failing to correct false testimony. Defendant, however, has failed to identify the testimony he claims was false, or offer any analysis applying the prosecutor's duty to correct false testimony to the facts of his case. Instead, defendant has merely attached numerous excerpts from the record without any

---

[2] "[T]he *constitutional* concept of proportionality under Const 1963, art 1, § 16 is distinct from the nonconstitutional principle of proportionality discussed in [*Milbourn*, 435 Mich at 650], although the concepts share common roots." *Benton*, 294 Mich App at 204.

[3] Supreme Court Administrative Order No. 2004-6, Standard 4.

analysis or explanation.  Accordingly, defendant has abandoned this claim.  *Miller*, 326 Mich App at 739.

## III.  CONCLUSION

Finding no error which entitles defendant to relief, we affirm defendant's convictions and sentences.

/s/ Patrick M. Meter
/s/ Colleen A. O'Brien
/s/ Brock A. Swartzle